IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

MICHAEL RUSSELL                                                    PLAINTIFF

V.                                              CIVIL ACTION NO. 1:20-CV-3-SA-DAS

CITY OF TUPELO, MISSISSIPPI, et al.                              DEFENDANTS

ORDER AND MEMORANDUM OPINION

Michael Russell commenced this action by filing his Complaint [1] on January 3, 2020. On December 31, 2020, the Defendants filed a Motion for Summary Judgment [68], requesting dismissal of all claims. The Motion [68] has been fully briefed, and the Court, having reviewed the parties' submissions and the applicable law, is prepared to rule.

*Relevant Factual and Procedural Background*

Michael Russell, a white male, formerly worked as a police officer for the City of Tupelo Police Department. Russell began working for the Police Department as a patrol officer on April 11, 1997. During the time period of 1997 through 2005, Russell was transferred within the Department multiple times, including a transfer to the Special Operations Division in 2000 and a transfer back to the Patrol Division in 2002.

In 2005, the City of Tupelo initiated the Tupelo Police Athletic League ("PAL"). PAL's mission is to build relationships and trust between the community and the Police Department. To achieve this mission, PAL hosts a variety of competitive athletic programs and other events. In the Fall of 2005, Russell was transferred to fill the newly created position of Executive Director of the PAL Program. Russell states that he "found his work at PAL to be the most satisfying work any police officer could do." [28], p. 3.

When Russell first assumed the Executive Director role, it was a full-time position. However, as additional support staff was added, in 2014, the Department decided to reorganize its PAL staffing by creating a Lieutenant position which would serve part-time as the Executive Director and part-time as the direct supervisor over reserves and school resource officers. Russell was awarded the position, thereby receiving a promotion to the rank of Lieutenant.

In early 2018, Lieutenant James Hood, a non-party to this action, retired from his position in the Patrol Division. Another officer in the Patrol Division, Sergeant James King, also announced his retirement around the same time. Thus, both a Lieutenant position and a Sergeant position within the Patrol Division were vacant.[1]

When the two aforementioned positions became vacant, Sergeant Tiffany Gilleylen, an African American female, worked in the Patrol Division. Gilleylen initially began working for the Tupelo Police Department in 1999. In 2015, prior to the events giving rise to the present action, she applied for a Patrol Sergeant position but did not receive the promotion. Thereafter, she filed suit against the City of Tupelo, alleging that the failure to promote her was racially motivated. The parties ultimately entered into a settlement agreement, one term of which required that the City establish objective criterion to be implemented into the Police Department's promotion system. The settlement agreement was entered into only a short period of time before Lieutenant Hood and Sergeant King's retirements. According to Russell, when Lieutenant Hood and Sergeant King's positions became vacant, the "natural progression would have been to promote officers within the department to fill these two (2) vacancies." [75], p. 6.

On February 23, 2018, Chief Aguirre and Deputy Chief Gilbert circulated to all Tupelo Police Department employees a Memorandum, which stated as follows:

---

[1] For the sake of clarity, the Court notes that, at this point in time and at all times pertinent to this action, Bart Aguirre held the position of Chief of Police and Allan Gilbert held the position of Deputy Chief.

Effective March 7, 2018
> Sergeant Brett Moyer will temporarily transfer to Patrol and will be assigned to Adam Shift.

Effective March 14, 2018
> Lieutenant [Michael] Russell will temporarily transfer to Patrol and will be assigned to Edward Shift.

[74], Ex. 17.

The Department did not open the vacant Lieutenant position for applications but, instead, Chief Aguirre, consistent with the language contained in the Memorandum above, filled the position by transferring Russell to the Patrol Division. Chief Aguirre stated that he decided to do so because he believed that Russell's leadership skills were needed in the Patrol Division and because he did not believe the current shift Sergeants at that time, including Sergeant Gilleylen, were ready to assume senior leadership positions. Although the Memorandum indicated that the transfer was temporary, Russell contends that it was temporary in name only, as there was no indication that he would be able to revert back to his old position. Furthermore, he asserts that "[t]he claim in the transferring email that the transfers were 'temporary' is contradicted by the fact that when Russell finally left in October, the City kept [Sergeant Brett Moyer] in Patrol and even promoted him to the position of lieutenant over Gilleylen." [75], p. 15. Additionally, Sergeant Moyer testified that Major Jackie Clayton informed him that his transfer to the Patrol Division "was not temporary, it was permanent." [74], Ex. 18, p. 13.

After being notified of his transfer to the Patrol Division, Russell met with Chief Aguirre and expressed his desire to continue working as Executive Director of PAL. According to Chief Aguirre, he "assured [Russell] that his PAL duties would remain as before. During this initial meeting, Aguirre also explained that he needed Russell's leadership in Patrol and that the transfer would benefit his chances for advancement in the Department." [69], p. 5. Russell contends that

he did not think that he, having been out of the Patrol Division for twelve years, was the best fit for the job and further contended that he "believed that he was a pawn to block Gilleylen's promotion." [75], p. 9. Russell further asserts that this opinion was widely shared within the entire Department. Shortly after the transfer occurred, Gilleylen filed a Charge of Discrimination with the EEOC, alleging that the decision to transfer Russell to the Patrol Division instead of promoting her was motivated by race. Gilleylen also states in her Affidavit that, in making the decision to transfer Russell, the City did not utilize the objective criterion which should have been incorporated following the resolution of her prior lawsuit. *See* [74], Ex. 26, p. 3.[2]

After meeting with Chief Aguirre, Russell scheduled a meeting with City of Tupelo Mayor Jason Shelton to discuss the transfer. During this meeting, Russell expressed to Mayor Shelton his dissatisfaction with the transfer and his desire to continue working with PAL. Russell alleges that while Mayor Shelton stated that he agreed with his position, Mayor Shelton took a "hands off" approach and no responsive action was taken.

Russell also alleges that Deputy Chief Gilbert harbored personal animosity toward him, which negatively impacted the functioning of the Police Department as a whole and Russell's ability to perform his individual job duties. For example, Russell contends that, despite being informed that he could continue to work with the PAL Program, Deputy Chief Gilbert became angry toward him every time he did so. Also, he asserts that Deputy Chief Gilbert refused to communicate with him, thereby making it impossible for him to effectively perform his Patrol Division duties.

Although Chief Aguirre stated that he wanted Russell to continue working with PAL, Russell contends that the role of Lieutenant "in charge of all Tupelo Patrol officers during a twelve-

---

[2] Gilleylen retired from the Tupelo Police Department on August 30, 2019. *See* [74], Ex. 26, p. 3.

hour shift" conflicted with his ability to do so. *See* [75], p. 8. Russell testified at his deposition that he knew being both an adequate Lieutenant over the Patrol Division and effectively assisting with PAL would be impossible. He attempted to perform both jobs for several months but contends that he was met with resistance by Deputy Chief Gilbert every time he attempted to participate in PAL activities. After meeting with Mayor Shelton on multiple additional occasions and no improvements being made to his working situation, Russell resigned from the Department effective October 2018. As stated by Russell, "[t]rying to perform both jobs was a 'set up to fail.'" [75], p. 12.

On January 3, 2020, Russell commenced this action. *See* [1]. In his Amended Complaint [28], he names the City of Tupelo, Chief Aguirre (in his individual capacity), and Deputy Chief Gilbert (in his individual capacity) as Defendants. Pursuant to 42 U.S.C. § 1983, Russell asserts claims for discrimination under 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment. He also asserts a claim under Title VI of the Civil Rights Act of 1964. Finally, Russell alleges a state law claim for intentional interference with contractual relations against Deputy Chief Gilbert only. In the present Motion [68], the Defendants request that the Court grant summary judgment in their favor on all claims.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Nabors v. Malone*, 2019 WL 2617240 at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Management of Louisiana, LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

Pursuant to Section 1983, Russell has asserted claims for liability under 42 U.S.C. § 1981 and the Equal Protection Clause. Additionally, he has asserted a claim pursuant to Title VI of the Civil Rights Act of 1964 and a separate state law claim against only Deputy Chief Gilbert. However, prior to addressing the merits of those claims, the Court feels compelled to address Russell's standing to bring this action, considering that Russell does not contend that he himself was discriminated against on the basis of his race but, rather, that the City's discrimination toward

another employee, Tiffany Gilleylen, negatively impacted the terms and conditions of his employment.

I.    *Standing*

As noted above, Russell does not allege that he was discriminated against because of *his* race. In fact, he admits that "the discriminatory animus was aimed at Gilleylen, not Russell." [75], p. 13. The Court will therefore consider at the outset whether Russell possesses standing to bring this action.

The Court first turns to the Supreme Court's decision in *Thompson v. North American Stainless, LP*, 562 U.S. 170, 131 S. Ct. 863, 178 L. Ed. 2d 694 (2011). In *Thompson*, the plaintiff and his fiancé were both employees of North American Stainless. *Id*. at 172. The plaintiff's fiancé filed an EEOC Charge against North American, and the plaintiff was terminated by North American three weeks later. *Id*. The plaintiff then filed suit, averring that North American improperly retaliated against him in violation of Title VII. *Id*. North American argued that the plaintiff, as a third party who did not file the charge of discrimination, lacked standing. *Id*.

Considering the standing issue, the Supreme Court noted two potential outcomes on opposite ends of the spectrum. *Id*. at 176. The Court first explained that "minimal Article III standing, which consists of injury in fact caused by the defendant and remediable by the court[]" was on one end of the spectrum. *Id*. The problem, however, as the Supreme Court noted is that "[i]f any person injured in the Article III sense by a Title VII violation could sue, absurd consequences would follow. For example, a shareholder would be able to sue a company for firing a valuable employee for racially discriminatory reasons, so long as he could show that the value of his stock decreased as a consequence." *Id*. at 176-77.

7

On the other hand, the Supreme Court considered North American's argument that Congress intended for Title VII to only cover the person who engaged in the protected activity. *Id.* at 177. The Supreme Court rejected this argument, specifically looking to the language of the statute which in pertinent part permits "a person claiming to be aggrieved" by an unlawful employment practice to initiate a civil action against the employer. *Id.* at 173. The Court particularly noted that, had Congress intended for standing to be limited in the fashion suggested by North American, "it would more naturally have said 'person claiming to have been discriminated against' rather than 'person claiming to be aggrieved.' We see no basis in text or prior practice for limiting the latter phrase to the person who was the subject of unlawful retaliation." *Id.* at 177.

Striking a balance between these two extremes, the Supreme Court adopted the "zone of interests" test, which had previously been applied in suits involving the Administrative Procedure Act and authorizes suits to challenge a federal agency by any "person . . . adversely affected or aggrieved . . . within the meaning of a relevant statute." *Id.* (quoting 5 U.S.C. § 702). The Court further noted:

> We have held that this language establishes a regime under which a plaintiff may not sue unless he 'falls within the "zone of interests" sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. We have described the 'zone of interests' test as denying a right of review 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. We hold that the term 'aggrieved' in Title VII incorporates this test, enabling suit by any plaintiff with an interest 'arguably sought to be protected by the statute,' while excluding plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII.

*Id.* at 177-78.

Applying the "zone of interests" test, the Court found that the plaintiff's interests were protected by Title VII. Particularly, the Court held:

> Thompson was an employee of [North American], and the purpose of Title VII is to protect employees from their employers' unlawful actions. Moreover, accepting the facts as alleged, Thompson is not an accidental victim of the retaliation—collateral damage, so to speak, of the employer's unlawful act. To the contrary, injuring him was the employer's intended means of harming [his fiancé].

*Id*. at 178.

The Fifth Circuit recently applied the "zone of interests" test in a similar context. *See Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664 (5th Cir. 2020). In *Simmons*, the plaintiff (Simmons) was employed by Prelle Financial Group as a third-party wholesaler of life insurance products to clients of UBS Financial Services. *Id*. at 665. Simmons' daughter, Jo Aldridge, was employed by UBS. *Id*. However, Aldridge claimed she was subjected to discrimination and filed a charge with the EEOC; she later resigned from her position and settled her claims. *Id*. Over the following months, Simmons' third-party relationship with UBS began to fall apart. *Id*. Simmons contended that "in retaliation for his daughter's complaints, UBS . . . eventually forbade him from doing business with its clients [which] effectively ended [his] employment at Prelle Financial[.]" *Id*. Simmons filed suit against UBS under Title VII, asserting that UBS "retaliated against his daughter by taking adverse actions against him." *Id*.

The sole issue on appeal was whether Simmons, a nonemployee, could sue under Title VII as the intentional target of the retaliation against his daughter. *Id*. at 666. The Fifth Circuit ultimately held that Simmons lacked standing, specifically finding that "the purpose of Title VII is to *protect employees from their employers' unlawful actions*. . . It would be a remarkable extension of Thompson—and of Title VII generally—to rule that a nonemployee has the right to

sue. The zone of interests that Title VII protects is limited to those in employment relationships with the defendant." *Id*. at 668 (quoting *Thompson*, 562 U.S. at 178) (emphasis added).

Recognizing that *Thompson* and *Simmons* analyzed standing in the context of Title VII and Russell brought his claims pursuant to 42 U.S.C. § 1981 and the Equal Protection Clause (not Title VII), this Court notes that the Fifth Circuit has reiterated on multiple occasions that "[t]he analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims." *See*, *e.g.*, *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017) (citing *Jones v. Robinson Prop. Grp. L.P.*, 427 F.3d 987, 992 (5th Cir. 2005)). Thus, this distinction is not critical. Furthermore, the Fifth Circuit recently set forth the test for statutory standing in the context of Section 1981 claims, specifically opining as follows:

> A plaintiff has statutory standing under [*Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 124 S. Ct. 1377, 188 L. Ed. 2d 392 (2014)] if it "falls within the class of plaintiffs whom Congress has authorized to sue under" a substantive statute. When assessing standing . . ., we look to (1) whether the plaintiff falls within the statute's "zone of interests" and (2) whether the plaintiff's alleged injuries were "proximately caused by violations of the statute."

*White Glove Staffing, Inc. v. Methodist Hospitals of Dallas*, 947 F.3d 301, 307 (5th Cir. 2020) (internal citations omitted).

In *White Glove*, the Fifth Circuit considered whether a corporation (White Glove), which was a staffing company that provided staffing to a client under a prospective contract, had statutory standing to sue when the client (Methodist Hospitals) purportedly racially discriminated against the provided staff member and terminated the prospective contract with White Glove. *Id*. at 304. White Glove alleged a violation of Section 1981 against Methodist; however, Methodist argued that only the individual staff member, not White Glove, had standing to sue. *Id*.

Applying the "zone of interests" test to determine whether White Glove possessed standing, the Fifth Circuit first looked to the language of Section 1981. *Id*. at 307. The Fifth Circuit

ultimately found that White Glove satisfied the "zone of interests" test, specifically finding that Methodist allegedly "impinged on its right to contract" and that its claim was not "so marginally related to or inconsistent with the purposes implicit in § 1981 that it cannot be reasonably assumed that Congress authorized White Glove to sue." *Id*. at 307-08 (citing *Lexmark*, 572 U.S. at 130). The Fifth Circuit also found that the second prong of the applicable test was satisfied, as the termination of its prospective contract was proximately caused by the purportedly discriminatory behavior. *Id*. at 308.

In the case at bar, the Court's analysis as to whether Russell has standing to pursue his Section 1981 claim is guided by the same two-prong test applied by the Fifth Circuit in *White Glove*. Thus, the Court first turns to whether Russell falls within the statute's zone of interests. In doing so, the Court notes that Russell was allegedly utilized as a "pawn" to further the Department's discriminatory scheme against Gilleylen. Russell was not a bystander or a third party but, rather, was employed by the Police Department. In the Court's view, this factor differentiates Russell's case from *Simmons*, where the Fifth Circuit determined that a nonemployee was not covered by Title VII. This Court finds this distinction critical. Viewing the evidence in the light most favorable to Russell, he was subjected to an adverse employment action because his employer sought to discriminate against a co-employee. The Court finds that this employment action, and the resulting harm to Russell, is not "so marginally related to or inconsistent with the purposes in § 1981 that it cannot be reasonably assumed that Congress intended [Russell to have standing] to sue." *White Glove*, 947 F.3d at 307-08.

As to the second prong, the Court has no trouble finding that Russell's alleged harm—being subjected to an adverse transfer and ultimately constructively discharged—has a "sufficiently close connection" to the type of conduct that § 1981 prohibits. *Id*. at 308. In reaching

11

this finding, the Court notes that, though Russell was admittedly not discriminated against because of *his* race, he does allege a tangible impact on *his* employment which was allegedly adverse and allegedly motivated by race. This distinguishes Russell from any other employee of the Police Department. In other words, permitting Russell to bring this action would not open the floodgates for every single employee of the Police Department to bring a discrimination suit since Russell can point to a tangible employment action that was taken in relation to his employment. *See*, *e.g.*, *Jackson v. Deen*, 959 F. Supp. 2d 1346, 1354 (S.D. Ga. 2013) (declining to recognize standing in Title VII when the plaintiff's purported injury was the deprivation of "harmonious working relationships with her African-American subordinates"). Additionally, the Court finds that allowing this action to proceed will not create precedent for the type of "absurd" results which the Supreme Court specifically sought to avoid in *Thompson*. *See Thompson*, 562 U.S. at 176-77.

In light of the foregoing, the Court finds that the applicable test is satisfied and specifically holds that Russell's purported injury falls within the "zone of interests" which Congress sought to protect. In reaching this conclusion, the Court further emphasizes that the "zone of interests" test is "not especially demanding." *White Glove*, 947 F.3d at 307. Although recognizing that this case is not synonymous to the typical employment discrimination case, the Court finds that Russell possesses standing. Having done so, the Court will turn to the merits of his claims and the arguments for dismissal raised by the Defendants.

## II.    *Section 1983 Claims*

"Regarding Section 1983, the United States Supreme Court has held that the statute's 'very purpose . . . was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action *under color of state law*.'" *Alexander v. McAdams*, 2017 WL 5642328, *3 (N.D. Miss. Apr. 18, 2017) (quoting

*Mitchum v. Foster*, 407 U.S. 225, 242, 92 S. Ct. 2151, L. Ed. 2d 705 (1972)) (emphasis in original). In order to state a claim under Section 1983, a plaintiff must "(1) allege he has been deprived of a right secured by the United States Constitution or the laws of the United States; and (2) demonstrate that the alleged violation was committed by a person acting under color of state law." *Weeks v. Thompson*, 2007 WL 316261, at *2 (N.D. Miss. Jan. 31, 2007) (citing *Cornish v. Correctional Services Corp.*, 402 F.3d 545, 549 (5th Cir. 2005)).

As noted above, Russell's Section 1983 claims for liability under 42 U.S.C. § 1981 and the Equal Protection Clause are asserted against the City of Tupelo and against Chief Aguirre and Deputy Chief Gilbert (in their individual capacities). Undoubtedly, a different standard is applicable to a Section 1983 claim against a municipality than is applicable to an individual capacity claim against a law enforcement officer. *See Weeks*, 2007 WL 316261, at *2 ("Municipal liability under section 1983 requires proof of (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose 'moving force' is the policy or custom."); *Mangieri v. Clifton*, 29 F.3d 1012 (5th Cir. 1994) (holding that law enforcement officers are entitled to qualified immunity "unless it is shown that, at the time of the incident, [the officer] violated a clearly established constitutional right."). Nevertheless, whether seeking to impose liability against a municipality or an individual officer, a Section 1983 plaintiff must first allege that he has been deprived of a right secured by the United States Constitution or federal law. *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (holding that in order to establish a Section 1983 claim, there must be "a deprivation of a right secured by federal law[.]").

While Chief Aguirre and Deputy Chief Gilbert have raised qualified immunity defenses and the City of Tupelo asserts that Russell lacks sufficient evidence as to the imposition of

municipal liability, the Court will first address the merits of Russell's claims that he was deprived of rights secured by federal law and the United States Constitution.

### A.  *Application of Burden-Shifting Framework*

Although Russell has brought his claims under Section 1981 and the Equal Protection Clause, the familiar *McDonnell Douglas* burden-shifting framework is applicable. *See*, *e.g.*, *Body by Cook*, 869 F.3d at 386 ("The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims."); *Mengistu v. Miss. Valley State Univ.*, 2017 WL 3880319, at *2 n. 2 (N.D. Miss. Sept. 5, 2017) ("The elements of the claims under Title VII and Section 1981 are identical. We therefore evaluate both claims using the same analysis."); *Giles v. Shaw Sch. Dist.*, 655 F. App'x 998, 1002 (5th Cir. 2016) (applying *McDonnell Douglas* burden-shifting framework to Equal Protection claim in same fashion as with Title VII claim); *Lee v. Conecuh Cty. Bd. of Educ.*, 634 F.2d 959, 962 (5th Cir. 1981) (recognizing the application of McDonnell Douglas to Equal Protection claims).

"To succeed on a claim for racial discrimination under Title VII or Section 1981, a plaintiff may show a *prima facie* case either through direct evidence of discriminatory motive, or circumstantial evidence under the *McDonnell Douglas* burden-shifting framework." *Mengistu*, 2017 WL 3880319, at *2 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). "If a plaintiff creates a presumption of discrimination by establishing a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." *Id*. (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). At this stage, the employer's burden is "one of production, not persuasion[,]" and it involves "no credibility assessment." *Id*. (quoting *Reeves*, 530 U.S. at 142; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 509, 509, 113 S. Ct. 2742, 125

L. Ed. 2d 407 (1993)). Then, if the employer sustains its burden, "the *prima facie* case is dissolved, and a plaintiff . . . must establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Id*. (citing *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

At the *prima facie* stage, Russell bears the burden of establishing that he "(1) suffered an adverse employment action, (2) was qualified for the position at issue, (3) belongs to a protected class, and (4) either received less favorable treatment than similarly situated employees outside the protected class or was replaced by a person outside the protected class." *Jackson v. Lowndes Cty. Sch. Dist.*, 126 F. Supp. 3d 772, 777 (N.D. Miss. 2015) (citing *McCoy v. Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007)).

Russell argues that he "has made a *prima facie* case of race discrimination, since he has proved that Gilleylen, a black person, was rejected for the position and that Russell, a white person, was transferred into the position. Because Russell, a person who had not been in Patrol for twelve (12) years was given the position, and a black person, who was the senior sergeant on the shift at issue was denied the position, Gilleylen was rejected under circumstances which give rise to an inference of unlawful discrimination." [75], p. 13 (citations omitted).

The Defendants make two main arguments as it pertains to the *prima facie* case. First, they contend that Russell's transfer to the Patrol Division did not constitute an adverse employment action. Second, they assert that Russell was not constructively discharged.

Regarding the first argument, "[f]or Title VII and § 1981 discrimination claims, we have held that adverse employment actions consist of 'ultimate employment decisions' such as hiring,

firing, demoting, promoting, granting leave, and compensating." *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 503 (5th Cir. 2014) (citing *McCoy*, 492 F.3d at 560) (additional citations omitted); *see also Hernandez v. Rush Enterprises, Inc.*, 2020 WL 7396511, at \*3 (E.D. Tex. Dec. 17, 2020) ("Actionable adverse employment actions are generally limited to tangible employment actions that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") (citations omitted). On the other hand, "[a]n employment action that does not affect job duties, compensation, or benefits is not an adverse employment action." *Id.* (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281-82 (5th Cir. 2004)) (citation omitted).

"[A] transfer or reassignment can be equivalent of demotion, and thus constitute an adverse employment action." *Id.* (citing *Alvarado*, 492 F.3d at 612-15). "To be the equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Id.* (citing *Alvarado*, 492 F.3d at 613). "Where the evidence produces no objective showing of a loss in compensation, duties, or benefits, but rather solely establishes that a plaintiff was transferred from a prestigious and desirable position to another position, that evidence is insufficient to establish an adverse employment action." *Perkins v. City of Greenwood, Miss.*, 2016 WL 1169499, at \*3 (N.D. Miss. Mar. 22, 2016) (citations omitted). Importantly, the transfer must be objectively worse and not solely based on the plaintiff's subjective preference. *Id.*; *see also Munoz v. Seton Healthcare, Inc.*, 557 F. App'x 314, 319 (5th Cir. 2014).

Russell alleges several ways in which the transfer negatively impacted his position and was objectively worse than his previous position. Specifically, he contends the transfer was perceived

by many officers as a design to block the promotion of an African American; that Russell was frustrated by trying to please two bosses with competing agendas; that he was not able to dedicate as much of his time to the PAL program; that being transferred to a position where he was required to report to Deputy Chief Gilbert negatively impacted him; that he was required to become re-acclimated with Patrol since he had not been in that Department for twelve years; that he could not adequately perform his duties in charge of Patrol and also adequately perform his duties as director of PAL; and that the transfer had an observable effect on him, causing him to become depressed. [75], p. 20-21.

Considering these arguments, the Court reiterates that the standard is an objective one, and "a plaintiff's subjective preference, for one position over another, or a mere change in schedule is not enough." *Perkins*, 2016 WL 1169499, at *4 (citing *Thompson*, 764 F.3d at 504-05; *Alvarado*, 492 F.3d at 613-14) (additional citations omitted). "Several factors the Fifth Circuit has considered in reassignment claims include: change in title, loss of compensation, change in benefits, loss of prestige, whether the new position is less interesting; loss of opportunity for advancement, and a significant diminishment of material responsibilities." *Id*. (citations omitted).

Many of Russell's assertions, such as his inability to continue to pursue his passion of furthering PAL or the fact that he did not want to spend time becoming reacclimated to the Patrol Division, are mere subjective preferences that can easily be disregarded. On the other hand, the record illustrates that, in his new role, Russell was essentially asked to continue directing the PAL program while also serving as a Lieutenant in the Patrol Division. The Court finds this fact critical. Though the parties have not provided any information indicating that Russell received a substantial pay increase, or any increase in pay at all, he was required and expected to take on the responsibilities associated with a Lieutenant in the Patrol Division while also leading the PAL

Program. Also, Major Clayton specifically testified as follows regarding the extensive responsibilities that would be placed on Russell as a result of the transfer:

> **Q.** You just expressed concerns about the PAL program?
>
> **A.** I did. Because I knew that running a shift, I knew running a shift was going to take a lot of time and a lot of energy, to put your energy into it. When you're at work, it's 12 hours of keeping up with all your personnel, any memos that might come down from other supervisors. And it seemed like to me and having had that job, it has been a few years now, but having had that job for ten years myself, I knew it was very time consuming.
>
> . . .
>
> **Q.** So you were concerned about the PAL program then? That was your concern?
>
> **A.** I was concerned about the PAL program. *I was concerned about whether or not, not just Michael but anybody put in that position would be able to handle both jobs.*

[74], Ex. 2, p. 8-9 (emphasis added).

In the Court's view, the additional expectations and duties which accompany trying to effectively work in two different Departments could render Russell's new position "objectively worse." *See Thompson*, 764 F.3d at 503. This is particularly true when considered in light of the specific difficulties Russell faced in his dealings with Deputy Chief Gilbert. The Court finds that Russell has come forward with sufficient evidence to create a genuine issue of material fact as to whether the transfer constituted an adverse employment action.

As a second argument at the *prima facie* stage, the Defendants contend that Russell was not constructively discharged. Regarding constructive discharge, the Fifth Circuit has explained:

> The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

*Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 342 (5th Cir. 2005) (quoting *Jurgens v. EEOC*,

903 F.2d 386, 390 (5th Cir. 1990)). The test for constructive discharge is an objective one, which

mandates that the Court consider "whether a reasonable person in the plaintiff's shoes would have

felt compelled to resign." *Id*. (citing *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 n. 19

(5th Cir. 1994)); *see also Clark v. Auger Servs., Inc.*, 443 F. Supp. 3d 685, 709 (M.D. La. 2020)

(quoting *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 741 (5th Cir. 1993)) ("The working

conditions must have been 'so difficult or unpleasant that a reasonable person in the plaintiff's

shoes would have felt compelled to resign.'"). When considering whether a constructive discharge

occurred, courts consider various factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4)
> reassignment to menial or degrading work; (5) badgering, harassment, or
> humiliation by the employer calculated to encourage the employee's resignation;
> or (6) offers of early retirement that would make the employee worse off whether
> the offer was accepted or not.

*Clark*, 443 F. Supp. 3d at 709 (quoting *Barrow*, 10 F.3d at 297; *Edwards v. Smitty's Supply, Inc.*,

2016 WL 3667361, at *7 (E.D. La. July 11, 2016)).

Applying these factors to this case, the Court notes that the fifth factor is particularly

relevant.[3] Specifically, Russell contends that Deputy Chief Gilbert often became agitated with him

when he attempted to perform any duties associated with the PAL Program. This made it extremely

difficult for Russell to accomplish his duties associated with the Program—or even participate in

the Program at all. Russell also alleges that Deputy Chief Gilbert refused to communicate with

him, essentially making it impossible for him to perform his Patrol Division duties in an effective

manner. Viewing this evidence in the light most favorable to Russell, the Court finds that he has

---

[3] In addition, although Russell was required to take on significantly more responsibilities, there has been
no contention that he receiving a corresponding salary increase to compensate him for shouldering those
additional responsibilities.

shown the existence of a genuine issue of material fact as to whether a reasonable person in his shoes would have felt compelled to resign. *See Keelan*, 407 F.3d at 342.

Having rejected both of the Defendants' arguments concerning the *prima facie* stage of the proceedings, the Court finds that Russell has carried his initial burden.

The burden now shifts to the Defendants, who maintain the "burden of articulating some legitimate, nondiscriminatory reason for the adverse employment action." *Snyder v. L-3 Comms. Vertex Aerospace, LLC*, 2020 WL 869977, at *6 (N.D. Miss. Feb. 21, 2020) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). Importantly, the Defendants have "a mere burden of production rather than a burden of persuasion." *Id*. (citation omitted).

The Defendants emphasize Chief Aguirre's deposition testimony that he "believed that Russell's skills and capabilities made him an excellent candidate for a leadership position within the Department and that Russell's chances for advancement would benefit from serving as a lieutenant in the Patrol Division." [69], p. 4. The Defendants also note that there was a shortage of Patrol Officers and that none of the Sergeants in the Patrol Division at that time, including Gilleylen, were ready to take on a leadership role. Although Russell disputes the veracity of such contentions, the Court must not engage in credibility determinations at this stage in the proceedings. *See Cervantez v. KMGP Servs. Co. Inc.*, 349 F. App'x 4, 8-9 (5th Cir. 2009) (noting that the employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment."). The Court finds that the Defendants have carried their burden.

The burden then shifts back to Russell to establish that the Defendants' reasons are pretextual. *Snyder*, 2020 WL 869977, at *6 (citing *McDonnell Douglas*, 411 U.S. at 802). At this stage, Russell "must prove that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination." *Id*. (quoting *Goudeau v. Nat'l Oilwell Varco, L.P.*,

20

793 F.3d 470, 477 (5th Cir. 2015); *Squyres v. Heico Companies, LLC*, 782 F.3d 224 (5th Cir. 2015)). "A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Id*. (citation omitted).

Russell contends that the decision to transfer him to the Patrol Division was motivated by the Defendants' desire to prevent Gilleylen from obtaining a promotion. As to his qualifications for the position, Russell emphasizes that he had not worked in the Patrol Division in twelve years and that others, such as Gilleylen, were much more qualified for the position. *See, e.g., Birchfield v. City of West Point, Miss.*, 2021 WL 277810, at *5 (N.D. Miss. Jan. 27, 2021) (citing *Maurer v. American Airlines*, 249 F. App'x 341, 343 (5th Cir. 2007); *Price v. Federal Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002)) ("[I]n a failure to promote case, a showing that the unsuccessful employee was clearly better qualified is enough to prove that the employer's proffered reasons are pretextual."). He also rebuts the contention that there was a shortage of Patrol Officers, noting "[t]hat contention is inconsistent with the fact that Moyer testified that the City also moved one Patrol sergeant, David Harville, out of Patrol and into the property room." [75], p. 15; *see* [74], Ex. 18, p. 16.[4] In addition, Russell notes Moyer's deposition testimony that Moyer's transfer was not temporary but rather would be permanent. *See* [74], Ex. 18, p. 13. Russell avers that this fact supports his argument that his transfer was not temporary, but was actually a permanent transfer utilized as part of a scheme to keep Gilleylen from being promoted.

Ultimately, at this stage in the proceedings, Russell need only establish the existence of a genuine issue of material fact. *See, e.g., Stennett*, 619 F. App'x 310, 318 (5th Cir. 2015) (citing

---

[4] The Court notes that Chief Aguirre specifically testified that the Patrol Division was "shorthanded at that particular time . . . We were extremely shorthanded because of our military obligations for our men and women and then also these that were out on sick." [74], Ex. 16, p. 10-11. He further stated that the shortage was "part of" the reason for Russell's transfer to the Patrol Division. *Id*. at p. 14.

*Reeves*, 530 U.S. at 151) (noting that, in this context, the reviewing court must evaluate all of the evidence "as a whole"). Viewing the evidence "as a whole"—particularly, the relative qualifications of Russell and Gilleylen, whether the transfer was permanent, whether there was actually a need for additional Patrol officers, and the circumstances surrounding Gilleylen and the purported animus harbored against her based upon her filing of a lawsuit against the City of Tupelo in 2015—the Court finds that Russell has met this burden.

Although recognizing that this case does not perfectly fit within the confines of the *McDonnell Douglas* burden-shifting framework, the Court acknowledges that the framework was "never intended to be rigid, mechanized, or ritualistic." *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S. Ct. 1478, 75 L. Ed. 2d 403 (1983) (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 2949, 57 L. Ed. 2d 957 (1978)). Russell has come forward with sufficient evidence to satisfy this standard.

### B.    *Qualified Immunity and Monell Liability*

Having found that Russell has established, at least for purposes of this stage in the proceedings, that his rights secured by federal law and the United States Constitution were violated, the Court must now turn to the Defendants' defenses. As noted above, Chief Aguirre and Deputy Chief Gilbert contend that they are entitled to qualified immunity, and the City of Tupelo avers that Russell lacks sufficient evidence to impose municipal liability. The Court will address these arguments in turn.

### i.    *Qualified Immunity*

"The doctrine of qualified immunity protects governmental officials from civil damages liability when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). "Qualified immunity balances two important interests—the

need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009). An officer may successfully invoke the defense of qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); *see also Cantu v. Rocha*, 77 F.3d 795, 805-06 (5th Cir. 1996).

"Courts generally carry out two steps when determining whether a defendant is protected by qualified immunity. The court asks whether the official 'violated a statutory or constitutional right' and whether 'the right was "clearly established" at the time of the challenged conduct.'" *Caldwell v. Medina*, 2020 WL 4043501, at *8 (W.D. Tex. July 17, 2020) (citing and quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011); *Harlow*, 457 U.S. at 818).

As to the first step—whether the Defendants violated Russell's statutory and constitutional rights, the Court relies upon the extensive analysis pursuant to the *McDonnell Douglas* framework set forth above. For purposes of this stage in the proceedings, this element is satisfied. Thus, the Court turns to the second step—whether the rights were clearly established.

"For a right to be clearly established, 'its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ratliff v. Aransas Cty., Tex.*, 948 F.3d 281, 287 (5th Cir. 2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)). This is an objective standard with the touchstone being "whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Zadeh v.*

23

*Robinson*, 928 F.3d 457, 468 (5th Cir. 2019) (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000)).

The Supreme Court has on multiple occasions cautioned that "clearly established law should not be defined at a high level of generality." *White v. Pauly*, --- U.S. ---, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017) (citing *Ashcroft*, 563 U.S. at 742); *see also Bustillos v. El Paso Cty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)) (noting that the inquiry "must be undertaken in light of the specific context of the case, not a broad general proposition."). "While there need not be a case directly on point, the unlawfulness of the challenged conduct must be 'beyond debate.'" *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (citing *District of Columbia v. Wesby*, --- U.S. ---, 138 S. Ct. 577, 590, 199 L. Ed. 2d 453 (2018)). Importantly, the Fifth Circuit has made clear that "[i]t is the plaintiff's burden to find a case in [his] favor that does not define the law at a 'high level of generality.'" *Bustillos*, 891 F.3d at 222 (quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018); *Cass v. City of Abilene*, 814 F.3d 721, 733 (5th Cir. 2016)).

It is also critically important to note that "[b]ecause the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law *at the time of the conduct*." *Tucker v. City of Shreveport*, --- F.3d ---, 2021 WL 1973562, at *3 (5th Cir. May 18, 2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)) (emphasis added). In fact, the Fifth Circuit, in *Tucker*, specifically noted a district court's error in looking to case law that was published subsequent to the event in question when analyzing qualified immunity. *Id.* at *6.

Keeping in mind the Court's duty to consider the challenged conduct against the backdrop of the law *at that time* is extremely important in this case. The challenged conduct—specifically, the employment decisions made by Chief Aguirre and Deputy Chief Gilbert, occurred in early 2018. The Court finds that fact of utmost importance here because many of the cases this Court cited in reaching the determination that Russell maintained a right which was allegedly violated by the employment decision were issued subsequent to that time. For example, the Fifth Circuit decided *White Glove* on January 15, 2020, and *Simmons* was decided on August 24, 2020—well after the relevant employment decision was made. As noted above, the Fifth Circuit, in those cases, specifically grappled with one of the issues the Court faces in this case—the parameters of standing in the employment discrimination context.

The Court also notes that while Russell has come forward with cases regarding Section 1981 and the Equal Protection Clause generally, he cites no cases wherein a plaintiff was admittedly not discriminated against because of *his* race but instead was used as a "pawn" for a discriminatory scheme directed toward a co-worker. The Court finds this distinction to be crucial, in light of its duty to define the right at issue with particularity. *See Shumpert v. City of Tupelo*, 905 F.3d 310, 320 (5th Cir. 2018) (noting that in order to find that a right is clearly established "we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity.").

Ultimately, taking all of these factors into account and considering the case law available *at the time of the challenged conduct*, the Court finds that Russell's rights in this context were not clearly established at the time of the subject employment decision. In other words, the Court cannot find that Chief Aguirre and Deputy Chief Gilbert acted in a plainly incompetent manner or that they knowingly violated Russell's rights. *See Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*,

475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)) ("Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.").

Consequently, the Court finds that Chief Aguirre and Deputy Chief Gilbert are entitled to qualified immunity. The Section 1983 claims asserted against them in their individual capacities are therefore dismissed *with prejudice*.

ii.    *Municipal Liability*

The City of Tupelo argues that, even if Russell survives summary judgment as to the merits of his Section 1983 claims, his claims still must be dismissed because he lacks sufficient evidence to establish municipal liability.

"While municipalities can be sued directly under § 1983, *Monell* establishes that they 'cannot be found liable on a theory of vicarious liability or respondeat superior.'" *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019) (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017); citing *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). "In other words, 'the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability.'" *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)) (additional citation omitted). "To overcome summary judgment on a municipal liability claim, a plaintiff must . . . 'demonstrate a dispute of fact as to three elements: that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right.'" *Id.* (quoting *Davidson*, 848 F.3d at 395).

In its Motion [68], the City of Tupelo attacks the second element, contending that the City of Tupelo cannot be held liable for the actions of Chief Aguirre because he was not the City's

policymaker. Specifically, the City asserts that "simply because Aguirre, as Chief of Police, was accorded the 'discretion' to undertake employment related decisions does not mean he was delegated 'policymaking authority' under the City of Tupelo's employment policies." [69], p. 19-20. Further, the City asserts that "Mayor Shelton and Chief Operating Officer Don Lewis exercised final control and authority regarding the Department's employment activities when they questioned Aguirre's basis for transferring Russel to the Patrol Division and directed that Russell maintain his position as Executive Director of PAL." [69], p. 20.

In response to the City's arguments on this point, Russell points to specific deposition testimony. When questioned about authority to approve a transfer within the Police Department, Mayor Shelton testified that "[i]t would ultimately be the chief's responsibility or authority. . . the ultimate responsibility would end with Chief Aguirre." [74], Ex. G, p. 12. Mayor Shelton also testified that he did not "think it would be appropriate for me to interfere in the day-to-day operations of the police department. You know, the promotions, the policies and procedures, overall." [74], Ex. G, p. 20. Russell also cites a previous opinion, *Hardy v. City of Tupelo*, 2009 WL 3678262 (N.D. Miss. Nov. 2, 2009), wherein this Court recognized that the City of Tupelo could be held liable for a personnel decision made by the Chief of Police.

Although the City attempts to describe the potential imposition of liability under these circumstances as respondeat superior liability, the Mayor himself testified that he viewed Chief Aguirre as the final decisionmaker as to personnel decisions within the Police Department. For practical purposes, this appears, in the Court's view, to be true as Chief Aguirre testified that he—not Mayor Shelton or the City's COO—made the decision to transfer Russell into the Patrol Division position. In other words, the City appears to acknowledge that Chief Aguirre was the one who made the decision yet it attempts to shield itself from municipal liability by passing off the

responsibility to others. The Court squarely rejects this argument. Russell has come forward with sufficient evidence to survive summary judgment on his Section 1983 claims for municipal liability against the City of Tupelo. He will be permitted to proceed on those claims.

     *III.*    *Title VI Claim*

The Court next turns to Russell's Title VI claim. In pertinent part, Title VI states "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "Title VI and Title IX seek to stamp out discrimination in programs receiving federal funds and ensure that federal resources do not support discriminatory practices." *Sewell v. Monroe Cty. Sch. Bd.*, 974 F.3d 577, 583 (5th Cir. 2020). "Title VI prohibits race discrimination in all programs receiving federal funds." *Id*. (citing 42 U.S.C. § 2000d). "Private individuals may sue to enforce [Title VI] and obtain both injunctive relief and damages." *Elalawy v. Lubbock Indep. Sch. Dist.*, 816 F. App'x 958, 963 (5th Cir. 2020) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 279, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)).

Claims under Title VI "may be brought *only* against the institution receiving federal funds, not employees of those institutions." *Sewell*, 974 F.3d at 582 (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009)) (emphasis added). Thus, Russell's Title VI claims against Chief Aguirre and Deputy Chief Gilbert cannot survive summary judgment. Those claims are dismissed.

As to his claim against the City of Tupelo, "[t]he essential elements of a Title VI claim are (1) there is race or national origin discrimination, and (2) the entity engaged in discrimination is receiving federal financial assistance." *Washington v. Jackson State Univ.*, 532 F. Supp. 2d 804, 810 (S.D. Miss. 2006) (citing *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio*,

40 F.3d 698, 706 n. 9 (5th Cir. 1994)). "The burden of proof in a Title VI case is the same as that for Title VII and other civil rights statutes." *Id*. (citing *Baldwin v. Univ. of Texas Med. Branch*, 945 F. Supp. 1022, 1031 (S.D. Tex. 1996)) (pronouncing that the burden-shifting analytical inquiry into intentional race discrimination claims is essentially the same for § 1981, § 1983, Title VI, and Title VII).

As to the *McDonnell Douglas* burden-shifting framework, the Court relies upon the above analysis and finds that Russell has come forward with sufficient evidence to survive summary judgment. The first element of the Title VI claim is therefore satisfied. The parties do not dispute the second element—the receipt of federal funding. Consequently, although the Title VI claims against Chief Aguirre and Deputy Chief Gilbert are dismissed *with prejudice*, Russell's Title VI claim against the City of Tupelo survives summary judgment.

IV.     State Law Claim

Finally, Russell asserts a state law claim for intentional interference with contractual relations against Deputy Chief Gilbert. "The elements of intentional interference with contract are: (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiff in his/her lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which acts constitute malice); and (4) that actual damage or loss resulted, and (5) the defendant's acts were the proximate cause of the loss or damage suffered by the plaintiff." *Alfonso v. Gulf Pub. Co., Inc.*, 87 So.3d 1055, 1060 (Miss. 2012) (quoting *Scruggs, Millette, Bozeman & Dent, P.A. v. Merkl & Cocke, P.A.*, 910 So.3d 1093, 1098-99 (Miss. 2005)).

Deputy Chief Gilbert makes two arguments for dismissal of this claim. First, he contends that a one-year statute of limitations is applicable to the claim under the MTCA and that the claim

is therefore untimely. Second, he contends that he, as Russell's supervisor, was "privileged" to interfere in Russell's at-will employment. *See*, *e.g.*, *Grice v. FedEx Ground Package System, Inc.*, 925 So.2d 907, 910 (Miss. Ct. App. 2006) ("One occupying a position of responsibility on behalf of another is privileged, within the scope of that responsibility and absent bad faith, to interfere with his principal's contractual relationship with a third person.").

The Court will first turn to Deputy Chief Gilbert's contention regarding the statute of limitations. On that point, Russell alleges that a three-year limitation applies, while Deputy Chief Gilbert contends that a one-year limitation period is applicable. Because the challenged conduct occurred in early 2018 and this action was not filed until January 2020, the determination as to the appropriate limitations period is of critical importance.

Specifically, Russell cites the Mississippi Court of Appeals' decision in *Wertz v. Ingalls Shipbuilding Inc.* for the proposition that a three-year limitations period is applicable. 790 So.2d 841 (Miss. Ct. App. 2000) ("Wertz's intentional interference with contract claim was filed within the three year period of limitation[.]"). However, Deputy Chief Gilbert asserts that because he "was clearly acting in his official capacity as Russell's ranking officer, the Mississippi Tort Claims Act's one year limitations period applies[.]" [78], p. 12. Russell cites *Black v. Ansah*, in which the Court of Appeals, after conducting a lengthy analysis, held that because the Mississippi Tort Claims Act provides the exclusive state law remedy for tort claims of this nature, the Act's one-year limitation period was applicable to an intentional interference with contractual relations claim. *Black v. Ansah*, 876 So.2d 395, 398 (Miss. Ct. App. 2003). This Court also notes that *Black* was decided after *Wertz*.

Relying on *Black*, the Court finds that a one year limitations period is applicable to Russell's state law claim. Because he filed the claim more than one year after the purported violation occurred, his claim is time-barred. It is therefore dismissed *with prejudice*.[5]

*Conclusion*

For the reasons set forth above, the Defendants' Motion for Summary Judgment [68] is GRANTED IN PART and DENIED IN PART. All federal claims against Chief Aguirre and Deputy Chief Gilbert in their individual capacities are dismissed *with prejudice*. Russell's state law claim against Deputy Chief Gilbert is also dismissed *with prejudice*. Russell shall be permitted to proceed on his Section 1983 and Title VI claims against the City of Tupelo.

SO ORDERED, this the 16th day of June, 2021.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE

---

[5] Since the Court is dismissing this claim as time-barred based on the statute of limitations, it need not address Deputy Chief Gilbert's second argument for dismissal.